## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA
### Case No.:_____

| | |
|---|---|
| Trevon L. Estes, *on behalf of himself and all other similarly situated*,<br><br>            Plaintiff,<br><br>    vs.<br><br>MRI Software LLC, and Albin Acquisition Corporation *d/b/a* Rental History Reports,<br><br>            Defendant. | **CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

1.      Plaintiff Trevon L. Estes brings this consumer class action against Defendants MRI Software LLC and Albin Acquisition Corporation *d/b/a* Rental History Reports alleging violations of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et. seq.* ("FCRA").

2.      Despite the public availability of court records that conclusively demonstrate that certain public records have either been expunged, sealed, and/or do not exist, Defendants routinely fail to obtain up-to-date information pertaining to the expungement or existence of pubic record information, and routinely publish harmful, misleading, and inaccurate tenant screening reports to landlords, property managers, property owners, managing agents, and rental agents (collectively "Property Managers") in violation of the FCRA, specifically, 15 U.S.C. § 1681e(b).

3.      Defendants' practices harm individual consumers seeking rental housing by

providing their prospective Property Managers with inaccurate, adverse information, thus harming interstate commerce.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction under 15 U.S.C. § 1681p and 28 U.S.C. § 1331. Venue in this Judicial District is proper under 28 U.S.C. § 1391(b) because the events or conduct giving rise to the claims occurred in this Judicial District.

## PARTIES

5.      Plaintiff Trevon L. Estes ("Plaintiff") is a natural person, and citizen of the State of Minnesota.  Plaintiff is a "consumer" as that term is defined under 15 U.S.C. § 1681a(c).

6.      Defendant MRI Software LLC ("MRI") is a Delaware limited liability company with its principal place of business located at 28925 Fountain Parkway, Solon OH 44139.  National Registered Agents, Inc. is the registered agent authorized to accept service on behalf of MRI at 4400 Easton Commons Way, Suite 125, Columbus, OH 43219.

7.      Defendant Albin Acquisition Corporation *d/b/a* Rental History Reports ("RHR") is a Minnesota corporation with its principal executive office located at 28925 Fountain Parkway, Solon OH 44139.  National Registered Agents, Inc. is the registered agent authorized to accept service on behalf of RHR at 1010 Dale Street North, Saint Paul, MN 55117.

8.      On January 9, 2019, MRI announced that it had acquired Defendant RHR. Upon information and belief, MRI continues to operate RHR under the name "Rental History Reports".

9.    Defendants have the same principal office address in Ohio, the same offices in Minnesota, and the same Chief Executive Officer, Patrick Ghilani.

10.    Defendants' Minnesota offices are located at 7900 W. 78th St., Suite 400, Edina, MN 55439.

11.    Upon information and belief, RHR employees are employed through MRI. The careers or job opening link on RHR's website redirects to MRI's website.

12.    Because Defendants are registered business entities, they are "persons" as that term is defined under 15 U.S.C. § 1681a(b).

13.    Defendants offer tenant-screening services to its clients by preparing tenant screening reports, and furnishing such reports to Property Managers.  *See Multi-Family & Property Managers: Tenant Screening*, https://www.rentalhistoryreports.com/multi-family-property-managers/tenant-screening/ (Jun. 11, 2020, 9:37 p.m.); *Residential Suite: Resident Screening*, https://www.mrisoftware.com/products/residential-property-management-software/resident-screening/ (Jun. 11, 2020, 9:46 p.m.); *see also* Aaron Durkee & Robyn Kunz, *Why "instant" Resident Screening Services Put Multifamily Property Managers At Risk*, MRISOFTWARE.COM (Jun. 3, 2020), https://www.mrisoftware.com/blog/instant-resident-screening-services-multifamily-property-managers-risk/.

14.    Defendant MRI markets itself as providing a resident screening service, and sells to its clients tenant screening products including an "MRI Resident Check" and proprietary resident screening score which it calls "Accuscore."

15.    The tenant screening reports provided and sold by Defendants are written

reports communicating information concerning consumers' credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living.

16.     The tenant screening reports that Defendants provide for a monetary fee are used and expected to be used for multiple purposes governed by FCRA, including establishing a consumer's eligibility for credit concerning household purposes or eligibility to obtain housing or rental property.  Thus, the tenant screening reports that Defendants sell to Property Managers are "consumer reports" as defined under 15 U.S.C. § 1681a(d).

17.     Defendants use the instrumentalities of interstate commerce for purposes of preparing or furnishing tenant screening reports, including sending reports by mail, and placing telephone calls to consumers and Property Managers.  Therefore, Defendants are "consumer reporting agencies" as that term is defined under 15 U.S.C. § 1681a(f).

## FACTUAL ALLEGATIONS

18.     The FCRA was crafted "to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilizes accurate, relevant, and current information in a confidential and responsible manner." *Beseke v. Equifax Info. Servs. LLC*, No. 0:17-cv-04971 (DWF/KMM), 2019 WL 6250756, at *3 (D. Minn. Nov. 22, 2019) (quoting *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3rd Cir. 2010)).

19.     In furtherance of that goal, the FCRA requires credit reporting agencies ("CRAs") such as Defendants to "follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report

relates." *See* 15 U.S.C. § 1681e(b).

20.    Among other things, the FCRA regulates the collection, maintenance, and disclosure of consumer credit report information by CRAs, including public record information.

21.    Further, the FCRA unambiguously requires CRAs such as Defendants to clearly and accurately disclose to consumers all information that the CRA maintains about them, including the sources that supplied the information. 15 U.S.C. § 1681g(a); *Cortez*, 617 F.3d at 711-12.

22.    Defendants purchase public records information, including without limitation information pertaining to residential eviction litigation ("eviction information"), from one or more private vendors instead of retrieving the actual underlying court records themselves – or even more manageable digital representations – for the purpose of creating and selling tenant screening reports to third-party Property Managers.

23.    The public records information obtained by Defendants are not the actual court records but rather, these are distilled versions of those records.

24.    The public records information Defendants purchase is merely a summary prepared by their vendors that does not include all the information or the most up-to-date information available at the courthouses or government offices where the records themselves are housed.

25.    These distilled records frequently have numerical and other factual errors, do not have the most updated status of the public records, and/or are associated with the wrong consumer's report.

26.    Defendants know that its public records vendors make mistakes in the condensed summary that it purchases for credit reporting purposes and that the information routinely does not include the most up-to-date status of the actual cases.

27.    Purchasing distilled, incomplete public records information was the impetus for regulatory investigations of the three major CRAs – *TransUnion, LLC, Equifax Information Services, LLC, and Experian Information Solutions, Inc. (commonly referred to as the "Big Three")* – and dozens of FCRA lawsuits throughout the United States.

28.    For example, in 2015, the Consumer Financial Protection Bureau ("CFPB") noted that CRAs did not adequately oversee their public records vendors:

> Examiners found that the oversight of public records providers by one or more CRAs was weak and required corrective action. For example, one or more CRAs had never conducted a formal audit of their public records providers. In addition, one or more CRAs did not have defined processes to verify the accuracy of public record information provided by their public records providers. In light of such weaknesses, Supervision directed one or more CRAs to establish and implement suitable and effective oversight of public records providers

*See CFPB, Supervisory Highlights, 2.1.1* (Summer 2015), available at http://files.consumerfinance.gov/f/201506_cfpb_supervisory-highlights.pdf (last viewed Jan. 29, 2020, 1:53 p.m.).

29.    Further, the CFPB expressed concern about the accuracy of public records information that the CRAs imported into their consumer databases:

> Examiners reviewed quality control processes with respect to the accuracy of consumer reports produced by one or more CRAs and found that, with certain exceptions, there were no quality control policies and procedures to test compiled consumer reports for accuracy. While processes existed to analyze and improve the quality of incoming data, there was no post-compilation report review or

sampling to test the accuracy of consumer reports. In light of these weaknesses, Supervision directed one or more CRAs to develop a plan with implementation timelines to establish quality controls that regularly assess the accuracy and integrity of the consumer reports and consumer file disclosures produced.

*See id.* at 2.1.2.

30.    Other regulators, including the New York Attorney General, initiated investigations of the Big Three in part due to similar problems with the accuracy and currency of public records information in credit reports.

31.    The Big Three ultimately entered into an agreement with the New York Attorney General. *See In re Investigation by Eric T. Schneiderman, Attorney General of the State of New York, of Experian Information Solutions, Inc.; Equifax Information Services, LLC; and TransUnion, LLC* (Settlement Agreement) http://www.ag.ny.gov/pdfs/CRA%20Agreement%20Fully%20Executed%203.8.15.pdf (last viewed Jan. 29, 2020, 2:06 p.m.).

32.    The Settlement Agreement subsequently launched the "National Consumer Assistance Plan" ("NCAP"), an initiative aimed, in part, at enhancing the accuracy of credit reports, including the accuracy and currency of public records information in consumer reports. *See CFPB, Quarterly Consumer Credit Trends* (February 2018) https://files.consumerfinance.gov/f/documents/cfpb_consumer-credit-trends_public-records_022018.pdf (last viewed Jan. 24, 2020, 2:07 p.m.).

33.    As of July 1, 2017, pursuant to the requirements of the settlement and the NCAP, the Big Three ceased including in civil judgment information in credit reports that did not meet certain minimum standards.  In practice, this meant that civil judgments

disappeared entirely from consumer reports prepared by the Big Three. *See id.*

34.    Although the Big Three stepped back from using public records information in some of their reporting products, other CRAs, like Defendant, continued to do so.

35.    At all times relevant to these allegations, Defendants were aware of the CFPB's and investigations of state attorneys general investigations into the Big Three's public records practices, the NCAP, the various public records class actions pending throughout the United States, and their obligations under the FCRA.

36.    Moreover, Defendants were fully aware of the problems associated with the incomplete and inaccurate information purchased from vendors of such information, and nevertheless continues to report public record information to potential Property Managers via tenant screening reports.

37.    RHR advertises on its website that its tenant screening reports should be used to deny consumers housing, by stating:

**Rental & Eviction History Reports**

You get access to in-depth and up-to-date court eviction data and outcomes. If a tenant has been previously evicted, then the likelihood of it happening again is significant.  Don't let a smooth talker slip through the cracks.  Make sure you're absolutely certain with this a thorough rental and eviction history report before you approve any application.

History always has a tendency to repeat itself, for better or worse. If a tenant has been evicted before or still owes money on a previous property then they aren't a good fit for you. Our comprehensive court eviction search won't let any past evictions slip by you. Access eviction records from every appropriate jurisdiction in every state (where available).

*See    Multi-Family    Landlords    &    Property:    Tenant    Screening*,

https://www.rentalhistoryreports.com/multi-family-property-managers/tenant-screening/

(Jan. 29, 2020, 5:58 p.m.) (emphasis in original).

38.    Defendants do not maintain reasonable procedures designed to assure maximum possible accuracy of the public record information in the reports they sell.  Based upon established policy and practice, Defendants regularly report inaccurate and out-of-date public record information pertaining to eviction cases that have been expunged and/or sealed from public view.

39.    As of the date of this Complaint, RHR is currently a defendant in two other individual actions alleging, in part, violations of 15 U.S.C. § 1681e(b) as a result of including nonexistent public record information in a tenant screening report.  *See e.g.*, *Jones v. Albin Acquisition Corporation dba Rental History Reports*, No. 0:20-cv-00317 (NEB/ECW) [ECF. 1], ¶¶ 9-18, 29-31 (D. Minn. Jan. 23, 2020); *Johnson v. Rental History Reports, et. al.*, No. 0:20-cv-01583 (JNE/KMM) [ECF. 1], ¶¶ 45-48, 66-68 (D. Minn. Jun. 17, 2019).

40.    Defendants' practices not only violate the FCRA as a matter of law, they exact serious consequences on rental housing applicants and interstate commerce, causing widespread harm to consumers.

41.    At all relevant times, information pertaining to eviction cases filed in Minnesota courts were publicly available online for free in the Minnesota Court Information System (MNCIS).  *See Minnesota Public Access (MPA) Remote*, http://www.mncourts.gov/access-case-records.aspx    (Jan.    30,    2020,    4:47    p.m.). Additionally, digital representations of all documents filed in such cases are publicly available for viewing for free in person.

42.     Furthermore, despite the plain language of 15 U.S.C. § 1681g(a)(2), and the available court guidance, Defendants, as a matter of common policy and procedure, fail to provide consumers who request a copy of their consumer file with all information Defendants maintain about the requesting consumer, including failing to disclose the third party vendor sources of public record information Defendants collect and report about them.

43.     Disclosure of the true source of a CRA's information is vital so that certain errors that originate at the source can be corrected, and so that consumers always know who is disseminating important information about them.

44.     Defendants' practices for obtaining and reporting public record information, and disclosing such information and its sources to consumers, is not accidental, nor a result of simple negligence, but instead a result of deliberately designed policies and procedures.

**THE EXPERIENCE OF THE REPRESENTATIVE PLAINTIFF**

45.     In 2017, Plaintiff was a resident at Cedarview Commons ("Cedarview") in St. Paul, Minnesota.

46.     In October 2017, Plaintiff made his monthly rental payment to Cedarview via money order.  Shortly thereafter, Cedarview offices were burglarized, wherein many of the residents' rental payments were stolen.  Plaintiff's money order was among the stolen rental payments.

47.     Cedarview mischaracterized Plaintiff's account as unpaid rent as opposed to funds taken from the burglary.  As a result, Cedarview filed an eviction action against Plaintiff in Ramsey County, Minnesota.  This record was filed in court.  An eviction record

is a type of public record, like a tax lien or judgment.

48.     After Cedarview realized and admitted its mistake, it informed Plaintiff that it would update Ramsey County District Court.

49.     In 2017, Cedarview simultaneously dismissed the eviction action against Plaintiff and requested that the eviction record be permanently expunged and sealed from public view.

50.     Expungement means "sealing a court record from public view. If your eviction record is expunged, then someone searching court files will not find a record of your case." *See Minnesota Judicial Branch, Landlord & Tenant Issues: Eviction*, http://www.mncourts.gov/Help-Topics/Landlord-and-Tenant-Issues.aspx (Jan. 30, 2020, 1:41 p.m.); *see also* Minn. Stat. § 484.014, subd. 1. (Expungement defined as "the removal of evidence of the court file's existence from the publicly accessible records."); *Black's Law Dictionary* at 621 (8th ed. 2004) (Expunge defined as "to erase or destroy").

51.     As a result of the requested expungement, Ramsey County District Court expunged the eviction record as defined under Minn. Stat. § 484.014. Specifically, the eviction record for Plaintiff was removed from publicly accessible records, and ceased to exist moving forward.

52.      At all times thereafter, there has been no eviction record associated with Plaintiff.

53.     In December 2018, Plaintiff applied to rent an apartment at Kellogg Square through Bigos Management ("Bigos") in St. Paul, MN. Bigos obtained a "Rental History Report" report ("First RHR Report") about Plaintiff from Defendants for a fee.

54.    Upon information and belief, Defendants did not conduct any independent search of eviction court records, but rather purchased the data it included in the RHR Report from a third-party vendor which it never discloses to consumers.

55.    The First RHR Report for Plaintiff identified public record information relating to the expunged, sealed, and non-existent eviction matter in Ramsey County.

56.    The public record information in the First RHR Report was, false, misleading, inaccurate, incomplete, and out-of-date because: (a) the Ramsey County eviction was voluntarily dismissed, expunged, and sealed in 2017; and (b) because there is no public or private record evidencing an eviction against Plaintiff.

57.    Even if Defendants were able to access expunged court information – *which they cannot* – the First RHR Report contains no reference to a judgment in favor of Plaintiff nor any reference to an expungement.

58.    As of the date of the First RHR Report, Defendants had failed to update the status of the public record information for nearly two years.

59.    On or about December 30, 2019, Plaintiff applied to rent an apartment at Galtier Towers through Bigos in St. Paul, MN.  A Bigos representative obtained a "Rental History Report" report ("Second RHR Report") about Plaintiff from Defendants for a fee.

60.    Upon information and belief, Defendants did not conduct any independent search of eviction court records, but rather purchased the data it included in the Second RHR Report from a third-party vendor which it never discloses to consumers.

61.    The Second RHR Report for Plaintiff identified inaccurate items of public record information pertaining to the expunged, sealed, and non-existent eviction matter for

Ramsey County.

62.     The public record information pertaining to the eviction in the Second RHR Report was identified under the heading "Court Eviction Search".

63.     The false, misleading, inaccurate, incomplete, and out-of-date items that appeared on Plaintiff's report stated, in relevant part, as follows:

| | |
|---|---|
| **Name:** | ESTES, TREVON |
| **Date of Birth:** | 02/08/1996 |
| **File Date:** | 10/27/2017 |
| **County:** | RAMSEY |
| **Case Number:** | HGCV17002446 |
| **Address:** | 2075 HWY 36 E #211 |
| **Plaintiff:** | CEDARVIEW COMMONS |
| **Judgment:** | CASE GONE |
| **Comments:** | **UD VERIFIED** |

(emphasis in original).

64.     The public record information in the Second RHR Report was false, misleading, inaccurate, incomplete, and out-of-date because the Ramsey County eviction was voluntarily dismissed, expunged, and sealed in 2017.

65.     The eviction information in the Second RHR Report was false, misleading, inaccurate, incomplete, and out-of-date because there is no public or private record evidencing an eviction against Plaintiff, let alone any information "*verifying*" an eviction.

66.     Even if Defendants were able to access expunged court information – *which they cannot* – the Second RHR Report contains no reference to a judgment in favor of Plaintiff nor any reference to an expungement.

67.     As of the date of the Second RHR Report, Defendants had failed to update the status of the public record information for over two years.

68.     Plaintiff made a request to Defendants for the information in their file that Defendants were reporting about him that Defendants treated as a file disclosure request pursuant to the FCRA, and in turn, Defendants sent him a copy of his RHR Report. The file Defendants provided did not identify their third party vendor source for the public record information attributed to Plaintiff.  Defendants' failure to comply with the law harmed plaintiff by depriving him of the ultimate source of the inaccurate public record, thus, preventing Plaintiff from being able to identify the source of the inaccuracy and prevent it from spreading and continuing to harm him in to the future.

69.     On or about January 23, 2020, Plaintiff disputed the inaccurate information in the Second RHR Report.  Plaintiff submitted the dispute directly with Defendants through Defendants' online dispute system.

70.     On January 24, 2020, Defendants removed the inaccurate public record information from Plaintiff's RHR Report.

71.     At all times pertinent hereto, Defendants' conduct was a result of its deliberate policies and practices, was willful, and carried out in reckless disregard for consumers' rights as set forth under sections 1681e(b) and 1681g(a) of the FCRA, and further assumed an unjustifiably high risk of harm to Plaintiff, and consumers across the country.

72.     Plaintiff has suffered actual damages, tangible injuries, and intangible injuries as a result of Defendants' false, inaccurate, and wrongful tenant screening report.

73.     As a result of Defendants' conduct: (a) Plaintiff was denied housing on at least two occasions; (b) Plaintiff was denied valuable statutorily mandated disclosure of

information (c) Plaintiff incurred monetary loses including application fees, mailing costs, and court record fees; (d) Plaintiff's credit worthiness was negatively impacted, decreasing his ability to obtain lower-cost credit, obtain loans, find a job, and to find housing; (f) Plaintiff had to waste time through multiple phone calls, meetings, and correspondence to apartments, attorneys, courts, legal aid, and Defendants; (g) Plaintiff had to waste time by review of his apartment records, court records, emails, and credit reports; and (h) Plaintiff suffered emotional distress, including anger, inconvenience, confusion, embarrassment, aggravation, and anxiety.

74.    All of Plaintiff's above-referenced injuries – both tangible and intangible – are actual, concrete injuries that are widely recognized by the United States Supreme Court, United States Court of Appeals for the Eighth Circuit, and the United States District Court for the District of Minnesota.

## CLASS ACTION ALLEGATIONS

75.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated, and seeks to certify the following Classes:

a.  Failure to Update Class – Nationwide

*For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendants that contained public record information that did not accurately reflect the current status and/or disposition of the public record information and for whom Defendants had not verified the public record information with the court within the 30 day period prior to the issuance of the report.*

b.  Failure to Update Subclass - Minnesota

*For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who were subjects of tenant screening reports created by Defendants that contained public record information from that State of Minnesota that did not accurately reflect the current status and/or disposition of the public record information and for whom Defendants had not verified the public record information with the court within the 30 day period prior to the issuance of the report.*

c.  Dispute Class - Nationwide:

*For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who were the subjects of tenant screening reports created by Defendants that contained public record information for which the consumer disputed the current status and/or disposition of the public record information and such public record information was subsequently removed by Defendants after Defendants' receipt of the dispute.*

d. Disclosure Class – Nationwide:

*For the period beginning five (5) years prior to the filing of this Complaint and continuing through the date of judgment, all consumers with an address in the United States and its Territories who made a request to Defendants which constituted or which Defendants treated as a request for a file disclosure, and to whom Defendants sent a document which did not include all of the information Defendants maintained about the requesting consumer, including the source(s) from which public record information in the file was obtained.*

76.    The Failure to Update Class, Failure to Update Subclass (Minnesota), the Dispute Class, and the Disclosure Class (collectively the "Classes" or "Class") shall be subject to the following exclusions, who are not members of the Classes: (1) Counsel for Plaintiff and the Classes, (2) Counsel for Defendants, and (3) the assigned Judge, Magistrate Judge, and their clerks and staff.

77.    This action has been brought, and may maintained, as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure because the Classes satisfy the

numerosity, commonality, typicality, adequacy, predominance, and superiority requirements under Fed. R. Civ. P. 23(a) and (b) for class certification.

**Rule 23(a)(1) - Numerosity**

78.     Defendants provide tenant screening reports to thousands of companies throughout the country. *See Our Team*, https://www.rentalhistoryreports.com/about-us/our-team/ (Jun. 12, 2020, 1:46 p.m.) (Thousands of companies rely on RHR's services every day); *see also Multifamily*, https://www.mrisoftware.com/solutions/multifamily/ (Jun. 11, 2020, 6:24 p.m.) (MRI provides 44,000 screening reports per month).

79.     Defendants' tenant screening reports are standardized, form documents, produced pursuant to uniform practices and procedures.  Of these tenant screening reports containing public record information, many public records have been expunged, sealed, and are nonexistent.   Furthermore, Defendant prepares and sends its disclosures to consumers using standardized policies and procedures.

80.     It is plausible Defendants failed to update these reports and failed to disclose its vendor information on such a large scale that joinder of all in this lawsuit would be impracticable.   Although the exact number of the class members is unknown, upon information and belief, the estimated number is in excess of 100 consumers.

81.     The identities of all class members are readily ascertainable through appropriate discovery, including but not limited to the business records of Defendants.

**Rule 23(a)(2) - Commonality**

82.     Common questions of law and fact that exist as to the Classes.  These common legal and factual questions include among others:

a. Whether Defendants provided tenant screening reports that contained public record information after such information had been expunged, sealed, or no longer existed;

b. Whether Defendants violated the FCRA by failing to disclose the names and contact information of its public record vendor source(s); and

c. Whether Defendants' FCRA violations were willful, negligent, reckless, or intentionally carried out in conscious disregard of the class members' rights.

83.    The common evidence that will drive resolution of the claims for the Classes is a list of consumers: who were the subject of a tenant screening report that contained outdated public record information, who disputed the public record information, and/or who received a file disclosure.

**Rule 23(a)(3) - Typicality**

84.    Plaintiff's claims are typical of the claims of all the other members of the Classes because Plaintiff has the same claims to relief as all other class members. Likewise, Plaintiff's claims are based on the same legal theories as the claims of all the other members of the Classes.

85.    The claims of Plaintiff and class members originate from the same conduct, practice, and procedure on the part of Defendants. Thus, the claims of each class member require proof of the same operative facts. Any defenses that Defendants may have to liability or damages with respect to Plaintiff's claims would be generally applicable to all members of the Classes.

**Rule 23(a)(4) - Adequacy**

86.    Plaintiff brings this lawsuit after an extensive investigation of Defendants'

alleged misconduct, with the intention to stop Defendants' unlawful practices, and to recover the same relief for all consumers affected.

87.    Because Plaintiff has no interest adverse and/or in conflict to the interests of the class members, Plaintiff will fairly and adequately protect the interests of all class members.

88.    Plaintiff's counsel practice exclusively in consumer protection litigation as it relates to consumer credit issues.  Plaintiff's counsel has been certified as class counsel in previous class actions which sought to enforce consumer rights laws.

89.    Neither Plaintiff nor his counsel have any interest which might cause them to not vigorously pursue the instant class action lawsuit.  Plaintiff and his counsel are committed to expending the time, energy, and resources necessary to successfully prosecute this action on behalf of the Classes.

**Rule 23(b)(3) – Predominance/Superiority**

90.    A class action is appropriate because the  common questions of law and fact common substantially predominate over questions that may affect individual class members.  Because all class members had their rights violated in the same manner by the same actions of Defendants, the answer to these common questions will advance the resolution of the litigation as to all class members.

91.    A class action is superior to all other available methods for the fair and efficient adjudication of the controversies raised in this Complaint because the costs to pursue individual claims would likely exceed what any one class member has at stake. Thus, members of the Classes have little interest in controlling separate actions when

considering the cost, risk, delay, and uncertainty of recovery in prosecuting these claims.

92.    The concentration of litigation of these claims in one forum will permit a large number of similarly situated persons to prosecute their common claims efficiently, without unnecessary duplication of effort and expense that individual actions would engender, and therefore, promote judicial economy.

93.    Statutory relief under the FCRA follows from evidence that Defendants provided tenant screening reports relating to the class members that contained public record information after such information had been expunged or sealed – not the subjective or individual experience of any class member.

94.    Whether Defendants violated the FCRA can be determined by examination of Defendants' policies and conduct and a ministerial inspection of Defendants' business records and publicly available eviction litigation records.

95.    Upon information and belief, few class members are aware that Defendants' actions were unlawful.  Thus, the class notice provides an opportunity for uninformed class members to learn about their rights and obtain relief where they otherwise would not have.

96.    Plaintiff and Plaintiff's counsel are not aware of any other pending class actions against Defendants related to violations of 15 U.S.C. §§ 1681e(b) and 1681g(a).

97.    A class action is appropriate because the prosecution of separate actions for individual class members creates a risk of inconsistent or varying adjudications which could establish incompatible standards of conduct for the parties engaged in the provision of tenant screening services.  Likewise, the prosecution of separate actions by individual class members would, as a practical matter, be dispositive of the interests of other members

who are not parties to the action or could substantially impair or impede their ability to protect their interests.

## COUNT I
## FAIR CREDIT REPORTING ACT - 15 U.S.C. § 1681e(b)

98.    Plaintiff restates and re-alleges the preceding allegations of this Complaint.

99.    Plaintiff brings Count I as a Class Action on behalf of himself, the Failure to Update Class, Failure to Update Subclass (Minnesota Class), and the Dispute Class.

100.    Defendants are liable to Plaintiff and the Classes for negligently and willfully failing to follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom a consumer report relates, in violation of 15 U.S.C. § 1681e(b).

101.    Specifically, Defendants failed to follow reasonable procedures to assure maximum accuracy of public record information contained in tenant screening reports prepared about Plaintiff and members of Classes, thereby publishing false, misleading, inaccurate, incomplete, and outdated public record information to their potential Property Managers.

102.    Defendants' conduct violated 15 U.S.C. § 1681e(b).

103.    As a result of Defendants' violations of the FCRA, Plaintiff and the Classes are entitled to actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o.

## COUNT II
## FAIR CREDIT REPORTING ACT - 15 U.S.C. § 1681g

104.    Plaintiff restates and re-alleges the preceding allegations of this Complaint.

105.    Plaintiff brings Count II as a Class Action on behalf of himself and the Disclosure Class.

106.    Defendants are liable to Plaintiff and the Disclosure Class for negligently and willfully failing to provide a complete copy of all of the information in consumers' files upon request, including the source(s) of the information, in violation of 15 U.S.C. § 1681g(a)(2).

107.    Defendants' conduct violated 15 U.S.C. § 1681g(a)(2).

108.    As a result of Defendants' violations of the FCRA, Plaintiff and the Disclosure Class are entitled to actual damages, statutory damages, punitive damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o.

## JURY TRIAL DEMAND

109.    Plaintiff is entitled to and hereby demands a trial by jury. *See* U.S. Const. amend. VII; Fed. R. Civ. P. 38.

**WHEREFORE**, Plaintiff Trevon L. Estes demands a trial by jury and prays for judgment against Defendants MRI Software LLC and Albin Acquisition Corporation *d/b/a* Rental History Reports as follows:

1.  Awarding judgment against Defendants in an amount to be determined at trial;

2.  Certifying the Failure to Update Class, the Failure to Update Subclass (Minnesota), the Dispute Class, and the Disclosure Class as described herein;

3.  Awarding Plaintiff actual damages, statutory damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o against Defendants;

4.  Awarding the Failure to Update Class, the Failure to Update Subclass (Minnesota), the Dispute Class, and the Disclosure Class actual damages, statutory damages, and reasonable attorneys' fees and costs pursuant to 15 U.S.C. §§ 1681n and 1681o

against Defendants;

5. Awarding Plaintiff, the Failure to Update Class, the Failure to Update Subclass (Minnesota), the Dispute Class, and the Disclosure Class any costs, litigation expenses, disbursements, and allowable attorneys' fees; and

6. Awarding Plaintiff, the Failure to Update Class, the Failure to Update Subclass (Minnesota, the Dispute Class, and the Disclosure Class such other and further relief as the Court deems proper, just, and equitable.

**TARSHISH CODY, PLC**

Dated:  July 20, 2020          By:   *s/ Adam R. Strauss*
                                      Adam R. Strauss (#0390942)
                                      ars@attorneysinmn.com
                                      Benjamin W. Tarshish (#0392691)
                                      btarshish@attorneysinmn.com
                                      6337 Penn Avenue South
                                      Minneapolis, MN 55423
                                      Telephone: (952) 361-5556
                                      Facsimile: (952) 361-5559

**FRANCIS & MAILMAN, P.C.**

Dated:  July 20, 2020          James A. Francis (#xxxxxxx)
                                      jfrancis@consumerlawfirm.com
                                      Edward Skipton (#xxxxxxx)
                                      eskipton@consumerlawfirm.com
                                      1600 Market Street, 25th Floor
                                      Philadelphia, PA 19103
                                      Telephone: (215) 735-8600
                                      Facsimile: (215) 940-8000
                                      *Pro hac vice* applications forthcoming

                                      *ATTORNEYS FOR PLAINTIFF*